Fish *vs.* Chapman & Ross.

---

No. 53.—WILLIAM FISH, plaintiff in error *vs.* CHAPMAN & ROSS, defendants in error.

[1.] One who contracts to transport goods from one point to another, and deliver them in *good order and condition, unavoidable accidents only excepted,* is not a common carrier, but is responsible on his contract as one.

[2.] To make a person a *common carrier,* he must exercise it as a common employment; he must undertake to carry goods for persons generally, and he must hold himself out as ready to engage in the transportation of goods for hire as a business, and not as a casual occupation *pro hac vice.*

[3.] *Unavoidable* is synonymous with *inevitable,* and *inevitable or unavoidable accidents* are the same with *the acts of God,* which mean any accident produced by physical causes which are inevitable; such as lightnings, storms, perils of the sea, earthquakes, inundations, sudden death, or illness.

[4.] A common carrier is in the nature of an insurer of the goods entrusted to his care, and is responsible for every injury sustained by them, occasioned by any means whatever, except only the *act of God* and *the King's enemies.*

[5.] Nor can he vary his responsibility by notice or special acceptance, such being void as contravening the policy of the law; but he may require the nature and value of the goods to be made known to him, and may avail himself of any *fraudulent* acts or sayings of his employers.

From Washington.

This was an action brought by Chapman & Ross, against William Fish, in Washington County Superior Court, and was tried before Judge HOLT, March Term, 1847.

It appeared that Fish, the plaintiff in error, received at the then head of the Central Rail Road, from the agent of transportation on that road, certain packages of goods belonging to Chapman & Ross, the defendants in error, which, by special contract he promised to deliver *in good order and condition* at Macon, *unavoidable accidents only excepted.* In attempting to cross a stream his wagon was upset, and the goods damaged. The action was brought to recover the loss sustained by the injury thus done to the goods. Upon the trial the special contract to deliver as above was proven, whereupon the Court below decided that the plaintiff in error, under his contract with Chapman & Ross, was a *common carrier,* and the defendants in error recovered.

To which decision of the Court below the plaintiff in error excepted.

FISH, for the plaintiff in error.

THOMAS & JOHNSON, for the defendants.

Mr. R. M. JOHNSON, for defendants, submitted the following points and authorities :

All railroads are common carriers, unless exempt by some special provision.

An agent of a railroad, giving a receipt of goods to a bailor for a wagoner, connects the wagoner with the railroad, and thereby makes him a common carrier.

A wagoner is a common carrier, whether transportation be his direct and principal employment, or only an occasional and incidental employment. *Smith Leading Cases, Coggs* vs. *Barnard,* 178, note referring to, 1 *Watts & Sergeant,* 285.

One who undertakes to carry produce or goods of any sort from one place on the river to another, is a common carrier. See *Smith L. C.* above, referring to *Peck Ten. R.* 270; 17 *Yerger,* 340, 342.

All persons carrying goods for hire come under the denomination of common carriers. *Petersdorff Abr. b.* 57.

Fish *vs.* Chapman & Ross.

Where a witness testifies that one is a common carrier, it must be taken that he knows what constitutes a common carrier.

Where a wagoner gives his receipt for goods restricting a liability which attaches to a common carrier, but not to a special bailee for hire, he admits himself to be a common carrier.

If a common carrier deviates from the voyage, he is liable for all losses, even those which arise from unavoidable accident. *Story on Bailments, sec.* 509; *Wright* 193; 5 *Petersdorff Abr.* 143; *Story on Bailment, sec.* 497.

The liabilities of a carrier by land and of a carrier by water are the same; or, if not the same, those of a carrier by land are greater. *Story on B.* 497.

A common carrier is liable for all losses which happen, except by act of God or public enemies. Act of God means something in opposition to act of man. 1 *T. R.* 27. Something occasioned by violence of nature. 1 *Wend. R.* 190, 195, 196; *Story on B. sec.* 511. Inevitable necessity. *Ib. sec.* 489; 19 *Wend. R.* 263.

A common carrier cannot restrict his liability by notice or express agreement in Georgia. He could not do so in England until 1796, and such restrictions then were confined almost exclusively to certain goods of great value and small bulk, and to a certain sum. He cannot, at common law, restrict his liability. He is an insurer. 1 *Esp. R.* 36; 19 *Wend. R.* 232, 251; *Story on B.* 493; 1 *Starkie R.* 186, 172; 2 *Hill R.* 623.

If a common carrier can limit his liability, a promise to carry safely, unavoidable accidents only excepted, is no limitation of his liability, "unavoidable accident" being synonymous with "act of God."

Mr. THOMAS, on same side in conclusion, contended, that if the party was not a common carrier, his obligations are precisely the same under his contract; and if any difference exists, he is even more strictly liable by his contract than a common carrier. *Story on B. sec.* 36,

Unavoidable accidents and inevitable accidents are the same, and both mean whatever occurs by the act of God. *Story on B. secs.* 511, 457; 2 *Bos. & Pul. R.* 419; *Smith L. Cases, Coggs* vs. *Bernard*, 33 *Law Lib.* 180.

Departing from the public road or highway when an accident happened, it is a conclusion of law that it was by negligence. *Story on B. secs.* 509, 413.

If the Court below erred in charging the jury that the party was a common carrier, still he was a private carrier, under as strong liability by contract as common carriers, and therefore error in this could not have controlled the verdict.

The Court did not err in charging the jury that leaving the road shows negligence.

*By the Court* — NISBET, J. delivering the opinion.

The plaintiff in error, William Fish, received at the then head of the Central Rail Road from the agent of transportation on that road, certain packages of goods belonging to the defendants in error, Chapman & Ross, which by a special contract he promised to deliver *in good order and condition* at Macon, *unavoidable accidents only excepted.* In attempting to cross a stream his wagon was upset and the goods damaged. Chapman and Ross brought suit against him to recover the loss sustained by the injury done to the goods. A number of points are made in the assignment, and some of them of great practical importance in this community. They grow out of the construction which the Court below put upon the contract for the carrying of these goods above recited. I shall not consider each point separately, believing that all of them will be discussed and decided in those which I shall particularly notice.

[1.] The Court below decided that the plaintiff in error under his contract with Chapman & Ross was a *common carrier*, to which opinion he excepts. The evidence upon this point is the contract and nothing more. It does not appear that carrying was his habitual business; all that does appear from the record is, that he undertook upon a special contract, and upon this occasion, to haul on his own wagon for a compensation specified, the goods of the defendants from the then terminus of the Central Rail Road to the city of Macon. Does such an undertaking make him a common carrier? That is the question, and we are inclined to answer it in [2.] the negative. A *common carrier* is one who undertakes to transport from place to place for hire, the goods of such persons as think fit to employ him. Such is a proprietor of wagons, barges, lighters, merchant ships, or other instruments for the public conveyance of goods. See Mr. Smith's able commentary on the case of *Coggs* vs. *Bernard,* 1 *Smith Leading Cases,* 172; *Forward* vs. *Pittard,* 1 *T. R.* 27; *Morse* vs. *Slew,* 2 *Lev.* 69; 1 *Vent.* 190, 238; *Rich* vs. *Kneeland,* Cro. Jac. 330; *Maving* vs. *Todd,* 1 *Stark,* 72;

*Brook* vs. *Pickwick*, 1 *Bing*. *R.* 218. Rail-way companies are common carriers. *Palmer* vs. *Grand Junction Canal Co*, 4 *M. & W. R.* 749.

" Common carriers (says Chancellor Kent,) undertake generally and *for all people indifferently*, to convey goods and deliver them at a place appointed, for hire, and with or without a special agreement as to price." 2 *Kent*, 598.

" It is not (says Mr. Justice Story,) every person who undertakes to carry goods for hire, that is deemed a common carrier. A private person may contract with another for the carriage of his goods and incur no responsibility beyond that of an ordinary bailee for hire, that is to say, the responsibility of ordinary diligence. To bring a person under the description of a *common carrier, he must exercise it as a public employment; he must undertake to carry goods for persons generally, and he must hold himself out as ready to engage in the transportation of goods for hire, as a business and not as a casual occupation "pro hac vice."* Story on Bail. sec. 495.

A *common carrier* is bound to convey the goods of any person offering to pay his hire unless his carriage be already full, or the risk sought to be imposed upon him extraordinary, or unless the goods be of a sort which he cannot convey, or is not in the habit of conveying. *Jackson* vs. *Rogers*, 2 *Show.* 327; *Riley* vs. *Horne*, 5 *Bing. R.* 217; *Lane* vs. *Cotton*, 1 *Ld.* *Ray* *R.* 646; *Edwards* vs. *Sheratt*, 1 *East. R.* 604; *Batson* vs. *Donovan*, 1 *B. & A. R.* 32; 2 *Kent*, 598; *Elsee* vs. *Gatwood*, 5 *T. R.* 143; 1 *Pick. R.* 50; 2 *Sumner R.* 221; Story on Bail. 322, 323; *Dudley S. C. Law and Eq. R.* 159.

It will be seen hereafter we hold that according to the common law as of force in this country in 1776, a *common carrier* cannot vary or limit his liability by notice or special acceptance, and shall advert to this subject again. For the present we state the proposition broadly, that he is in the nature of an insurer of the goods entrusted to his care, and is responsible for every injury sustained by them occasioned by any means whatever, except only the *act of God and the King's enemies*. 1 *Inst.* 89; *Dale* vs. *Hall*, 1 *Wils.* 281; *Covington* vs. *Willan, Gow* 115; *Davis* vs. *Garrett*, 6 *Bing.* 716; 2 *Kent*, 597; *Coggs* vs. *Bernard*, 2 *Ld. Ray*, 918; 1 *T. R.* 27; 3 *Esp. R.* 127; 5 *Bing. R.* 217.

It is from these definitions and from the two propositions stated, that we are to determine what constitutes a person a common carrier. I infer then that the business of carrying must be *habitual* and not *casual*. An occasional undertaking to carry goods will not make a

person a common carrier; if it did, then it is hard to determine who, in a planting and commercial community like ours, is not one; there are few planters in our own State owning a wagon and team, who do not occasionally contract to carry goods. It would be contrary to reason, and excessively burdensome, nay, enormously oppressive, to subject a man to the responsibilities of a common carrier, who might once a year or oftener at long intervals, contract to haul goods from one point in the State to another. Such a rule would be exceedingly inconvenient to the whole community, for if established, it might become difficult in certain districts of our State to procure transportation.

The undertaking must be general and for *all people indifferently.* The undertaking may be evidenced by the carrier's own notice, or practically by a series of acts, by his known habitual continuance in this line of business. He must thus assume to be the servant of the public, he must undertake for *all people.* A *special* undertaking for *one man* does not make a wagoner, or any body else, a common carrier. I am very well aware of the importance of holding wagoners in this country to a rigid accountability; they are from necessity greatly trusted, valuable interests are committed to them, and they are not always of the most careful, sober and responsible class of our citizens. Still the necessity of an inflexible adherence to general rules we cannot and wish not to escape from. To guard this point therefore, we say, that he who follows wagoning for a livelyhood, or he who gives out to the world in any intelligible way that he will take goods or other things for transportation from place to place, whether for a year, a season, or less time, is a *common carrier* and subject to all his liabilities.

One of the obligations of a common carrier, as we have seen, is to carry the goods of any person offering to pay his hire; with certain specific limitations this is the rule. If he refuse to carry, he is liable to be sued, and to respond in damages to the person aggrieved, and this is perhaps the safest test of his character. By this test was Mr. Fish a common carrier? There is no evidence to make him one but his contract with Chapman & Ross. Suppose that after executing this contract, another application had been made to him to carry goods, which he refused, could he be made liable in damages for such refusal upon this evidence? Clearly not. There is not a case in the books, but one to which I shall presently advert, which would make him liable upon proof of a single carrying operation.

Fish *vs.* Chapman & Ross.

The extent of his liability, and his inability to vary that liability by notice or special acceptance, is another test.   A common carrier is liable at all events, but for the act of God and the King's enemies; and he cannot limit or vary that liability.   Whereas a carrier for hire in a particular case, is only answerable for ordinary neglect, unless he by express contract assumes the risk of a common carrier; his liability may be regulated by his contract. We do not think this undertaking would give to Mr. Fish that character which would preclude him from defining his liability in any other contract.   By this contract he may be liable *pro hac vice* as a common carrier, for *that* is a different thing.

Upon these views we predicate the opinion, that the plaintiff in error was not a common carrier.   From the way in which the opinion of the court is expressed in the bill of exceptions, I am left somewhat in doubt whether the able judge presiding in this cause, intended to say that the plaintiff in error was a common carrier, or that under his contract he was liable as such.   If the former, we think he erred; and if the latter, as we shall more fully show, we think with him.   In either event we shall not send the case back; for if he meant to say that the plaintiff upon general principles was a common carrier, thinking as we do that he is liable under this contract as such, he will not be benefited by the case's going back.

In conflict with these views, it has been held in Pennsylvania, that " a wagoner who carries goods for hire, is a common carrier, whether transportation be his principal and direct business, or an occasional and incidental employment."   *Gibson, Chief Justice, in Gordon* vs. *Hutchinson,* 1 *Watts & Serg. R.* 285.   This decision no doubt contemplates an undertaking to carry generally without a special contract, and does not deny to the undertaker the right to define his liability.   There are cases in Tennessee and New Hampshire which favour the Pennsylvania rule, but there can be but little doubt that that case is opposed to the principles of the common law, and its rule wholly inexpedient.   *See Story on Bail. secs.* 457, 495; *Bac. Ab. Carrier A.;* 2 *Bos. & Pul.* 417 ; 4 *Taunt.* 787; *Jones Bail.* 121; 1 *Wend. R.* 272; 6 *Taunt. R.* 577 ; 2 *Kent,* 597.

Assuming then that Mr. Fish was not a common carrier, what is he ?   This is a bailment for hire, "*locatio operis mercium vehendoram ;*" the fifth in the learned classification of bailments, made by Holt C. J. in Coggs *vs.* Bernard.   Mr. Fish is a private person contracting to carry for hire.   The next question is what are his

liabilities? And this brings us to the main point of error charged upon the Court below, and that is, that it erred in ruling that according to his contract the plaintiff in error was liable as a common carrier. In all cases of carrying for hire by a private person, we state that he is bound to ordinary diligence and a reasonable exercise of skill, and is not responsible for any losses not occasioned by ordinary negligence, *unless he has expressly by the terms of his contract taken upon himself such risk.* *Story on Bail.* sec. 457 ; 2 *Ld. Ray.* 909, 917, 918; 4 *Taunt. R.* 787 ; 6 *Taunt. R.* 577; 2 *Marsh. R.* 293; *Jones on Bailm.* 103, 106, 121 ; 1 *Bell Com.* 461, 463, 467; 2 *Bos. & Pul.* 416 ; 8 *Car. & Payne,* 207 ; 2 *Kent,* 597.

[3.] In this case there is a special contract defining the party's liability, and he does not therefore come under the rule last stated; he is liable according to his contract. There are two things to be carefully noted in it, to wit: *first,* the undertaking of the bailee (having as the receipt expresses it, received the goods in "good order and condition,") to deliver them " in like good order and condition." *Second.* The qualification of the liability of the bailee, which is expressed in these words to wit, "*unavoidable accidents only excepted.*" As we understand it, the contract means that the plaintiff in error will deliver the goods in good order and condition, unless prevented by *unavoidable accident.* If the exception were out of the contract what then would be the liability of Mr. Fish ? Upon the authority of the case of *Robinson* vs. *Dunmore,* 2 *Bos. & Pul. R.* 417, I should be inclined to hold that the undertaking to deliver the goods *in good order and condition,* is equivolent to a warranty to carry them safely, or to deliver them safely. If it is, Mr. Fish according to that case, would be liable as a common carrier. See *Story on Bailm.* sec. 457 ; 2 *Bos. & Pul.* 417.

But we do not rest our decision upon this view of the contract; we look at that with the exception in it. What, then, is the effect of the exception ? We think it is to make him liable at all events and for every thing except for *unavoidable accidents* It remains then to inquire into and determine what is the legal meaning and effect of these words. And first it may be material to say, that the word *unavoidable* is not the word usually used in the books in this connexion, *but inevitable.* And further to say, that these words are in legal as well as common parlance, synonymous.

*Unavoidable accidents* are in our opinion, the *acts of God.* The latter words express the same acts, and no more than the former;

Fish *vs.* Chapman & Ross.

the two phrases mean the same thing. *See Story on Bailm. secs.* 25, 511 ; 2 *Kent,* 597.

What then are *acts of God* or *unavoidable accidents ?* for it is from these only, that this party is protected. By the act of God is meant, any accident produced by physical causes which are irresistible ; such as lightning, storms, perils of the sea, earthquakes, inundations, sudden death or illness. *Story on Bailm. sec.* 25 ; 2 *Kent,* 597. The act of God excludes all idea of human agency. *McArthur & Hurlbut* vs. *Sears,* 21 *Wend. R.* 190. In this case it is said, " no matter what degree of prudence may be exercised by the carrier or his servants, although the delusion by which it is baffled, or the force by which it is overcome be inevitable, yet if it be the result of human means the carrier is responsible." See also 1 *Murphy,* 173 ; 2 *Bailey,* 157 ; *Idem,* 421.

As the exception in this contract extends only to unavoid- [4.] able accident, or acts of God, and does not embrace the King's enemies, the bailee could not be protected from liability of losses occasioned by them. Even if the goods had been destroyed by the public enemy, he would have in that event been liable. The liability of common carriers goes even yet further ; for if goods committed to them are lost by their neglect, through the agency of natural causes which are in themselves irresistible, they are liable ; so rigid and severe are the obligations and duties of this common, but not very well understood calling. Our opinion is, then, that the exception of *unavoidable accidents* excludes all other exceptions in this case, " *expressio unius est exclusio alterius.*"

And that Mr. Fish was liable at all events and on every account, but for losses occasioned by *unavoidable accidents ;* that unavoidable or inevitable accidents are the same with the acts of God ; and as common carriers are liable for losses on every account but for the acts of God and the King's enemies, so therefore is his liability the same as that of the common carrier, except in so far as it is greater in this, that he is not, by his contract, protected as the common carrier is at common law, against losses caused by the public enemy. The upsetting of the wagon on a decayed bridge across a stream, which was the accident which occasioned the loss in this case, is not, in our judgment, *an unavoidable accident.* We therefore find no error in the Court, in holding that Mr. Fish was on his contract liable as a common carrier. With these views of this contract, we do not conceive that it is at all important to say a word upon the question of negligence.

Fish *vs*. Chapman & Ross.

[5.] I have said that a common carrier cannot vary his liability as it existed at common law in 1776, by notice or special acceptance. On account of the importance of this subject, I propose to give it a more minute exposition. This is an age of Rail Roads, Steam Boat Companies, Stage Companies, locomotion and transportation. It is an era of stir, men and goods run to and fro,—and common carriers are multiplied. The convenience of the people and safety of property depend more now, I apprehend, upon the rules which regulate the liability of these public ministers, than at any other period of the world's history. Steam, as a transporting power, has supplanted almost all other agencies, and it is used for the most part by public companies or associations. It is very important that their liability should not only be accurately defined, but publicly declared. Anterior to 1776 the common carrier was an insurer for the delivery of goods entrusted to him, and liable for losses occasioned by *all causes* except the act of God and the King's enemies, and without the power to limit his responsibility. That this was the law, is proven by the numerous authorities which I have before referred to. No adjudication before that time had relaxed its stringent but salutary severity. It is of consequence to establish this fact, because the common law, as it was usually of force before the Revolution, is made obligatory upon this Court by our adopting statute. It is said by Mr. Story that Lord Coke recognised the right of modification, in a note to Southcote's case; and also that this right was admitted in Morse *vs*. Slue, 1 *Vent*. 238. These are *dicta* which recognised the right before the era of 1776.

And these are not adjudications—*mere dicta* unsupported by authoritative decisions—they reverse nothing, establish nothing. Mr. Story does not himself claim that there was any modification of the rule before that era. He does say that the right to modify their common law liability "is now (1832) fully recognised." *Story Bailm. sec.* 549. All the cases (and they are numerous) in support of. his statement are since our revolution. We do not however question that statement. Chancellor Kent says, "The doctrine of the carrier's exemption by means of notice, from his extraordinary responsibility, *is said* not to have been known until the case of *Forward* vs. *Pittard* in 1785, and it was finally recognised and settled by judicial decision in Nicholson *vs*. Willan in 1804." 2 *Kent*, 606.

The saying to which the chancellor has reference, was made

✗ especially, women and mules

in 1818 by Burrough J. in *Smith* vs. *Horne*, 8 *Taunt*. 144, and is this, " The doctrine of *notice* was never known until the case of *Forward* vs. *Pittard*, 1 *T. R.* 27, which I argued many years ago." "I lament that the doctrine of notice was ever introduced into Westminster Hall." The case then of Forward *vs*. Pittard is the first, in which the doctrine of notice is recognised according to Mr. Justice Burrough, and that was in 1785. It was not until 1804 that it was finally settled by judicial decision in *Nicholson* vs. *Willan*, 5 *East R.* 507; Twenty-eight years after the Declaration of Independence, the question of notice in all its bearings was reviewed with great learning and ability in *Holister* vs. *Nowlen*, 19 *Wend. R.* 234. I refer to that case now, simply for the purpose of saying that the learned judge in that opinion declared " that the doctrine that a carrier may limit his responsibility by notice, was wholly unknown to the common law at the time of our revolution."

Thus we think it is made manifest that in 1776, by the common law, a carrier could not limit or modify his extraordinary responsibility by notice. That it has been allowed since that time we admit, and to this point see 5 *East*, 507; 1 *H. Black*. 298; 3 *Taunt*. 264 ; 2 *M. & S.* 1; 8 *Taunt*. 146 ; 4 *B. & Ald*. 39 ; 5 *Bing*. 217; 4 *Price R.* 34; 4 *Camp.* 41. Still, however, in England by common law since the revolution, a carrier cannot by special agreement exempt himself from all responsibility, so as to evade altogether the policy of the law ; he cannot exempt himself from liability in case of gross negligence and fraud. *Story Bailm. sec.* 549; 5 *Bing*. 218 ; 2 *Moore & Payne*, 331, 341, *S. C.*; 5 *B. & Ald.* 342 ; *Idem.* 350; 2 *B. & Ald.* 356 ; 3 *Camp.* 267; 16 *East*, 244, *S. C.*; 4 *Price*, 31 ; 2 *Moore*, 18, *S. C.*; 2 *Car. & Payne*, 76. "It is perfectly well settled (we quote from Kent,) that the carrier notwithstanding notice has been given and brought home to the party, continues responsible for any loss or damage resulting from gross negligence or misfeasance in him or his servants." 2 *Kent*, 607. The notices which are allowed in England since the revolution, go only the length of protecting the carrier from that responsibility which belongs to him as an insurer.

A distinction is sought to be drawn in some of the books between a *notice* carried home to the knowledge of the bailor and a special acceptance or contract; I cannot see that there is any difference. A notice contains the terms and conditions upon which the carrier will serve the public, or some limitation of his extraordinary responsibility, which when known and acted upon by his customer,

is a contract; as much so as if the same stipulations were made by a separate contract with each individual customer. The only difference is in the mode of proof; the rule of evidence is different and that is all. It has been so decided, particularly in New York. 2 *Hill N. Y. R.* 624; 19 *Wend.* 281.

It may be safely asserted that the American decisions, with scarcely an exception, sustain the old common law doctrine. Mr. Wallace, in his Notes to Smith's Leading Cases, holds the following language: "That it is possible for a common carrier by either a general notice or a special acceptance to limit his extraordinary liability, is a position which it is believed is not supported by the authority of any adjudged case in the United States." 1 *Smith Leading Cases*, 183. The reverse doctrine is permanently settled in New York. We, then, adhere to the sound principles of the common law, sustained by the courts of our own Union, and hold notices, receipts and contracts, in restriction of the liability of a common carrier, as known and enforced in 1776, void, because they contravene the policy of the law. *Holister* vs. *Nolen,* 19 *Wend. R.* 234; *Camden and Amboy Transportation Co.* vs. *Belknap,* 21 *Wend. R.* 355; *Cole* vs. *Goodwin,* 19 *Wend.* 251; *Gould* vs. *Hill,* 2 *Hill N. Y. R.* 623; 3 *Hill R.* 9, 20; *Story on Bailm.* 4 *edit.* 558, *note;* 9 *Watts R.* 87; 4 *Harr. & John. R.* 317; 10 *Ohio R.* 145; 2 *Kent,* 608, *note.*

The British Parliament, declaring the sense of the British lawyers to a very great extent, has restored the old law as to the responsibility of carriers. *See Stat.* 11, *Geo. IV, and Stat.* 1, *Will. IV, ch.* 68; *for these statutes, consult* 1 *Harrison Dig.* 551, *title Carriers,* 4 *edit.* 1837. *Also* 19 *Wend. R.* 243, 249; *and Smith's Mercantile Law,* 233, 238, 2d *Lond. edit.* 1838.

The only modification of the common law rule which we admit, is the right of the carrier, by notice brought home to the passenger, to require the latter to state the *nature and value* of the property bailed, and to avail himself of any fraudulent acts or sayings of the bailor. 19 *Wend. R.* 251; 21 *Wend.* 354; 21 *Idem.* 153; 2 *Hill N. Y. R.* 623.

The reasons given by eminent jurists in support of the law of carriers, as we now hold it, are entirely satisfactory, and apply with far greater force now than when they were announced. Holt, C. J. in his opinion in *Coggs* vs. *Bernard,* an opinion which alone has made him immortal, calls it " a politic establishment, contrived by the policy of the law for the safety of all persons the necessity of whose affairs oblige them to trust these sort of persons, that they

may be safe in their ways of dealings, for else these carriers might have an opportunity of undoing all persons that had any dealings with them, by combining with thieves, &c. and yet doing it in such a clandestine manner as would not be possible to be discovered. And that is the reason the law is founded upon in that point."

In *Forward* vs. *Pittard,* Lord Mansfield says : " The law presumes against the carrier to prevent litigation, collusion, and the necessity of going into circumstances impossible to be unravelled." It is not the reward which he gets by virtue of his contract which charges him as an insurer; it is true that he is paid for his risks, but it is because he is in fact a *public officer,* in whose fidelity the public is compelled to trust, and whose infidelity it is so difficult, if not impossible, to establish by proof. The *place* of the carrier is a *public office.*

In *Ansell* vs. *Waterhouse,* 2 *Chitty R.* 1, Holroyd, J. said: " This action is founded on what is *quite collateral* to the contract, if any; and the terms of the contract, unless changing the duty of a common carrier, are in this case *quite immaterial.* The declaration states an obligation *imposed upon him by law.* This is an action against a person who, by ancient law, held as it were *a public office,* and was bound to the public. This action is founded on the general obligation of the law." The reasons of the rule may be summed up as follows :

The carrier is recognised as a public agent; for his services he is entitled to ample reward and is not bound to perform them unless it is paid or tendered; *ex necessitate rei* the most unqualified confidence is reposed in him; this confidence is indispensable to the exercise of his vocation. From the nature of his calling, the utmost facilities are at his control for fraudulent conduct and collusive combinations, and for the same reason his frauds or combinations are difficult of proof. He enters into this line of business voluntarily and with a knowledge of all its hazards, for he is justly presumed to know the laws of the land. The law then, looking to the great interests of commerce, and guarding with parental care the rights of the greatest number, makes him an insurer of the property delivered to him. With what resistless force does not this reasoning apply to the ten thousand incorporations of our own country ? Strong in associated wealth; strong in the mind which is usually enlisted in their management; and yet stronger, far stronger, in the large immunities and extraordinary privileges with which their charters invest them. If these, as carriers, can

46

Fish *vs.* Chapman & Ross.

vary their liability at all, at what limits does the power stop ? where are its boundaries ?   Outside of the obligations which their charters impose, there would be neither bounds nor limitations; the citizens would be at their mercy, bound by their power and subject to their caprices.   The inconveniences of the modern English rule are well portrayed by Bronson J. in his opinion in Holister *vs.* Nowlen, whilst exhibiting its effects in England.   "Departing as it did (says Mr. Bronson,) from the simplicity and certainty of the common law rule, it proved one of the most fruitful sources of legal controversy which has existed in modern times.   When it was once settled that a carrier might restrict his liability by a notice brought to his employer, a multitude of questions sprung up in the courts which no human foresight could have anticipated. Each carrier adopted such a form of notice as he thought best calculated to shield himself from responsibility without the loss of employment, and the legal effect of each particular form of notice could only be settled by judicial decision.   Whether one who had given notice that he would not be answerable for goods beyond a certain value unless specially entered and paid for, was liable in case of loss to the extent of the value mentioned in the notice, or was discharged altogether; whether notwithstanding the notice he was liable for a loss by negligence, and if so, what degree of negligence would charge him; what should be sufficient evidence that the notice came to the knowledge of the employer; whether it should be left to the jury to presume that he saw it in a newspaper which he was accustomed to read, or observed it posted up in the office where the carrier transacted his business, and then whether it was painted in large or small letters; and whether the owner went himself or sent his servant with the goods, and whether the servant could read—these and many other questions were debated in the courts whilst the public suffered an almost incalculable injury in consequence of the doubt and uncertainty which hung over this important branch of the law."   Well might the judges lament that the doctrine was ever admitted into Westminster Hall.   *See* 1 *Bell Com.* 474.

Thus, whether satisfactorily or not, have we disposed of the real questions made in this cause.   Let the judgment of the Court below be affirmed.