### J. M. PACE MULE COMPANY v. SEABOARD AIR LINE RAILWAY COMPANY.

(Filed 20 November, 1912.)

1. **Contracts—Carriers of Goods—Bills of Lading.**
    The execution of a bill of lading by the carrier to transport the property for the consideration expressed therein is a contract between the carrier and the shipper.

2. **Same—Public Duties.**
    In addition to the contractual obligations as expressed by the executed bill of lading issued, the law imposes upon the common carrier other obligations and duties by reason of the privileges it has, as such, in the exercise of the right of eminent domain, which can only be conferred by law in consideration of public service, and by reason of its enjoying a virtual monopoly of the carriage of freight within certain distances.

3. **Same.**
    It is the duty of a common carrier, independent of contract, to transport safely and to deliver within a reasonable time the shipment for which it issues its bill of lading.

**4. Same—Tort.**

The negligent failure of a common carrier to safely deliver the subject-matter of its bill of lading is a tort for which the carrier is liable independently of its contract.

**5. Carriers of Goods—Contract—Negligence—Exemption.**

A common carrier may not, by contract, absolve itself from the consequences of its own negligence in the transportation of the subject-matter of its bill of lading, or exempt itself from liability, partial or total, thereby caused.

**6. Same—Live-stock Bill of Lading.**

A common carrier cannot, by fixing the valuation of a shipment of mules at not exceeding $100 for each animal, in its live-stock bill of lading, limit recovery to that amount, as such would be an attempt to contract against its own negligence to that extent, and a provision to that effect in the bill of lading is void. *Jones v. R. R.*, 148 N. C., 449; *Winslow v. R. R.*, 151 N. C., 250, cited and overruled.

**7. Same—Federal Questions—Common-law Liability—Statutes.**

An action brought in the State court, involving the construction of a live-stock bill of lading issued by a common carrier for the transportation of live stock from another State to a point in North Carolina, where the recovery is limited to $100 on each · animal shipped, and wherein the recovery exceeds the amount stipulated for in the bill of lading, does not raise a Federal question, and will be governed by the decisions of our own courts as to the common-law doctrines applicable, or by any laws the Legislature may make relating thereto.

**8. Same—Discrimination—Common Law.**

A recovery for injury to live stock caused by the negligence of the carrier in transporting a car-load shipment from another State to a North Carolina point, under a live-stock bill of lading, exceeding the amount fixed therein as the value of each animal, is not a discrimination in favor of the plaintiff or an interference with the Interstate Commerce Act, there being no express provision of the act in regulation of such matters, and nothing in abrogation of the common-law doctrine.

**9. Same—United States Supreme Court—State's Decisions—Practice—Jurisdiction.**

The Supreme Court of the United States recognizes and follows the decisions of the State courts on questions involving the right of a common carrier to relieve itself, by contract, of the effects of its negligent acts in transporting stock, under its live-stock bill of lading, from a point beyond the State, when

the action is brought to recover damages therefor in the State court, though otherwise in cases originating in the Federal jurisdiction.

10. **Carriers of Goods—Interstate Commerce Acts—Live-stock Bill of Lading — Limited Liability—Negligence—Interpretation of Statutes.**

There being no express language in the act of Congress known as the Interstate Commerce Act abrogating the common-law right of a plaintiff to recover of the carrier the full amount of damages he may have sustained by reason of the defendant's negligence in a shipment of stock, under the carrier's live-stock bill of lading fixing the valuation of each animal, if there is any abrogation of the right, it must be by implication, and then only when it would render the act of Congress nugatory, which does not apply in cases of this character.

11. **Interstate Commerce Acts—Commission—State's Laws—Incidental Matters.**

The mere fact that Congress has created the Interstate Commerce Commission and given to it a large measure of control over interstate commerce does not deprive the State of the right to enforce laws which may incidentally affect commerce, in the absence of action by Congress or rules and regulations of the Commission as to the particular matters to be inquired of.

12. **Interstate Commerce Acts — Commission — Provisions—Negligence—Remedy—Common Law—Interpretation of Statutes.**

The act of Congress and the rules and regulations of the Commission are to compel the common carrier to the performance of its duties, and the rates prescribed are to afford the transportation of property safely and with reasonable care, and are not based upon the assumption that the carrier will not perform its duty; and in the absence of any provision for a remedy for the carrier's negligence, or for relieving it from the consequence of its negligence, there is no restriction upon the application of the common-law doctrine as held by the courts of the State.

13.* **Interstate Commerce Act—Carriers of Goods—Live-stock Bill of Lading — Limited Recovery — Actual Damages—Interpretation of Statutes.**

The right of action of a plaintiff to recover for the negligence of a common carrier an amount in excess of the valuation of a mule shipped in a car-load, and covered by a stipulation as to valuation of each animal, is preserved by the proviso of the act of Congress known as the Interstate Commerce Commission Act, as amended in 1906.

BROWN and WALKER, JJ., dissenting.

APPEAL by defendant from *Cline, J.,* at May Special Term, 1912, of WAKE.

This action was originally brought by the plaintiff against the Seaboard Air Line Railway and the Louisville and Nashville Railroad Company to recover $310 for the death of a mule alleged to have been caused by the negligence of the defendants in the course of transportation from East St. Louis, Ill., to Raleigh, N. C. The mule in question was one of a car-load of twenty-six shipped by the Maxwell-Crouch Mule Company to the plaintiff company on 3 March, 1911. The mules arrived at Raleigh 8 March, 1911. The injury to the mule was apparent when he was unloaded, and he was sent to the stable of a veterinary surgeon by the defendant's agent. A few days after being sent to the stable, the mule died.

At the trial the court instructed the jury that there was no evidence of negligence on the part of the Louisville and Nashville Railroad Company, and the verdict rendered placed the responsibility for the mule's death entirely on the Seaboard Air Line Railway.

The defendant pleaded the provisions of the Act to Regulate Commerce, as amended, as restricting the plaintiff's right to recover more than $100 for the death of this mule, and offered in evidence tariffs and classifications on file with the Interstate Commerce Commission, from which it appeared that the rate charged and the valuation fixed in the contract upon which this shipment moved are in accordance with the published tariff rate. The defendants also pleaded the provisions of the contract of shipment, fixing the value of the mule at $100, as a bar to plaintiff's right to recover more than that amount under the law as declared by the Supreme Court of North Carolina.

The contract recited a rate of $170 per car, and contained this provision: "Should damage occur for which the said carrier may be liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed . . . for a horse or mule $100 . . . which amounts it is agreed are as much as such animals as are herein agreed to be transported are worth."

The defendant also offered evidence tending to prove that the rate on horses and mules from National Stock Yards, Ill., to Raleigh, N. C., via Louisville and Nashville Railroad Company and Seaboard Air Line, is $170 per standard car, plus $1 bed charges and feed charges en route, when regular live-stock contract is executed, which limits liability of carrier not to exceed $100 per animal in case of loss or damage. In case the shipper desires not to accept contract limiting liability, he can increase the valuation of the animals, but for every increase of 100 per cent or fraction thereof in the value of his animals the freight rate is increased 20 per cent more on the car.

The jury returned the following verdict:

1. Was plaintiff's mule injured by the negligence of the defendant Louisville and Nashville Railroad Company, as alleged in the complaint? Answer: No.

2. Was plaintiff's mule injured by the negligence of the defendant Seaboard Air Line Railway, as alleged in the complaint? Answer: Yes.

3. Did the plaintiff comply with the contract of shipment as to the giving of notice to the railroad company (Seaboard) as to his claim for damages? Answer: Yes.

4. What damages, if any, is plaintiff entitled to recover? Answer: $285.

His Honor, being of opinion that the clause in the bill of lading limiting the value to $100 did not prevent the recovery of the damages sustained by negligence, and that to permit such a recovery did not interfere with the Act to Regulate Interstate Commerce, rendered judgment in favor of the plaintiff for $285 and costs, and the defendant excepted and appealed.

*S. Brown Shepherd for plaintiff.*
*Murray Allen for defendant.*

ALLEN, J. The execution of a bill of lading by a railroad company establishes a contractual relationship between it and the shipper, the carrier agreeing, for a consideration, to transport and to deliver, and the shipper agreeing to pay the consideration. This is the contract. Elliott on Railroads, vol. 4, sec. 1415. In addition to the obligations contained in the contract,

the law imposes upon the company other obligations and duties, and justifies its right to do so because the company is a creation of the law, enjoys a virtual monopoly of the carriage of freight within a certain distance, and exercises the right of eminent domain, which can only be conferred in consideration of public service. *Branch v. R. R.*, 77 N. C., 349.

"He (the common carrier) exercises a public employment, and has duties to the public to perform." *York Co. v. R. R.*, 70 U. S., 112.

"Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the public at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." *Munn v. Illinois,* 94 U. S.

"Railroads are common carriers, and owe duties to the public." *Joy v. R. R.*, 138 U. S., 51.

These duties of the common carrier, as such, do not rest upon contract, but are imposed by law (Elliott on Railroads, vol. 4, sec. 1454), and exist independently of contract, having their foundation in the policy of the law. *Merritt v. Earle,* 29 N. Y., 122.

Among these duties imposed by law, independent of contract, are to carry safely and to deliver within a reasonable time, and a breach thereof is a tort. *Peanut Co. v. R. R.*, 155 N. C., 150, and at p. 164.

In *Robinson v. Threadgill,* 35 N. C., 41, and in *Bond v. Hilton,* 44 N. C., 308, *Nash, C. J.,* says: "Where the law, from a given statement of facts, raises an obligation to do a particular act, and there is a breach of that obligation, and a consequential damage, an action on the case founded on the tort is proper," and in *Williamson v. Dickens,* 27 N. C., 265, although the plaintiff could have sued in contract, he was allowed to sue in tort, and thereby avoid the defense of a discharge in bankruptcy.

These cases are approved in *Solomon v. Bates,* 118 N. C., 315, and the principle was approved by the Supreme Court of

the United States in *Guardian T. & D. Co. v. Fisher*, 202 U. S., where the Court says: "Doubtless in the same transaction there may be negligence and breach of contract. If a railroad company contract to carry a passenger, there is an implied obligation that he will be carried with reasonable care for his safety. A failure to exercise such care, resulting in injury to the passenger, gives rise to an action *ex contractu* for breach of the contract, or as well to an action for the damages on account of the negligence—an action sounding in tort."

These authorities and many others not only hold .that an action in 'tort may be maintained for breach of. duty, resulting in damage, although the duty is imposed because of the relationship created by contract, but they go.further, and classify the action as one to recover damages for negligence.

"In every case involving negligence there are necessarily three elements essential to its existence: (1) The existence of a duty on the part of defendant to protect plaintiff from the injury; (2) failure of defendant to perform that duty; and (3) injury to plaintiff from such failure of defendant." 29 Cyc., 419.

If these views are sound, we come to the consideration of the question of the right of the common carrier to limit its liability by contract.

Prior to 1776, the common carrier was an insurer, and liable for losses occasioned by all causes except the act of God and the King's enemies, and without power to limit its responsibility (*Fish v. Chapman*, 2 Ga., 349, 46 A. D. 393); but this rule has been modified to the extent that the extraordinary liability as an insurer may be limited. 5 Eng. Rul. Cases, 346, note.

The courts have not, however, gone further and permitted the carrier to absolve itself from the consequences of its own negligence. *Moulton v. R. R.,* 31 Minn., 85; *R. R. v. Wynne,* 88 Tenn., 320; *Hudson v. R. R.,* 92 Iowa, 231; *R. R. v. Hall,* 124 Ga., 322; *Express Co. v. Blackman,* 28 Ohio St., 156; *R. R. v. Lockwood,* 84 U. S., 357; *R. R. v. Solan,* 169 U. S., 135; *Calderon v. Steamship Co.,* 170 U. S., 272.

The consensus of opinion on this question is stated in Cyc., vol. 6, 385 and 388, as follows: "While considerations of public policy have been potent in determining the courts to recog-

nize a rule of liability in the case of common carriers much stricter than that recognized as applying in the case of ordinary bailees, the courts have not thought it necessary to deny the parties to a contract of carriage the right to exonerate the carrier from his extraordinary liability, and the general proposition has been almost universally recognized that by special agreement, or by notice to the shipper acquiesced in by him, the common carrier may limit his liability to that of a private carrier. It is, therefore, stated as a general proposition in many cases that the common carrier may by contract limit his liability, except for damages or loss resulting from the negligence of the carrier or his agents or servants"; and on page 388: "The proposition amplified in the last subdivision, that a common carrier may by contract reduce his liability to that of a bailee for hire, is not to be extended so as to authorize him as such bailee for hire to exempt himself from liability for negligence. Whatever may be the rule as to ordinary bailees, it is well settled that it is contrary to public policy to allow a common carrier to relieve himself in any capacity from liability for negligence or misconduct. A different conclusion has been reached by the New York courts, and it has been held in a line of cases which are out of harmony with the great current of authority, that inasmuch as the shipper has a right to insist on the common-law liability of the carrier if he sees fit, a contract exempting the carrier from liability for his own negligence will be sustained. Outside of New York the current of authorities is almost unbroken that for reasons of public policy carriers cannot exempt themselves by any contract, notice, or stipulation from liability for the consequences of their own negligence." The author, Judge McClain, of the Supreme Court of Iowa, comments on the New York cases in the note, and says: "Even the courts of New York regard the rule as so anomalous that they qualify it by the further rule, that a general contract of exemption from loss, even from loss of a particular description, will not be interpreted as an exemption from loss due to the carrier's own negligence, unless it is expressly so stipulated. *Wilson v. R. R.,* 97 N. Y., 87; *Holsapple v. R. R.,* 86 N. Y., 275."

MULE CO. *v.* R. R.

It is the settled policy of this State that the common carrier cannot, by contract, exempt itself from liability, partial or total, caused by negligence. *Phifer v. R. R.,* 89 N. C., 316; *Capehart v. R. R.,* 81 N. C., 438; *Mitchell v. R. R.,* 124 N. C., 238; *Parker v. R. R.,* 133 N. C., 335; *McConnell v. R. R.,* 144 N. C., 90.

In the *Phifer case, supra,* this Court said: "It is well settled that no conditions in a common carrier's bill of lading can be allowed to exempt it from liability for losses occasioned by the negligence or mismanagement of its own servants and employees; for protection against such liability is a duty inseparable from their occupation as public agencies. This responsibility cannot be avoided, and a stipulation to this effect will not be enforced against such as may require their services, even when by reference inserted in the contract of transportation, the parties to it in this respect not standing upon equal footing.

"Amidst varying adjudications upon the extent to which common carriers may limit their liabilities by special agreement, we are disposed to accept the guidance of those made in the Supreme Court of the United States, not only because of the great learning and ability of the judges who constitute it, but that there ought to be uniformity in the law and its administration in all the States, and interstate and local commerce ought to be settled upon a permanent and well understood basis. We shall, therefore, seek instruction from that source to aid in arriving at a satisfactory conclusion as to the question now before us. *Mr. Justice Field* remarks, in reference to such special limitations: 'Where such stipulation is made, and it does not cover losses from negligence or misconduct, we can perceive no just reason for refusing its recognition and enforcement.' *York Co. v. R. R.,* 3 Wall., 113. So in *R. R. v. Manufacturing Co.,* 16 Wall., 328, *Mr. Justice Day* says: 'Whether a carrier, when charged upon his common-law responsibility, can discharge himself from it by special contract, is not an open question since the cases of *Navigation Co. v. Bank,* 6 How., 344, and *York Co. v. R. R.,* 3 Wall., 113. In both these cases the right of the carrier to restrict or diminish his general liability by special contract, which does not cover losses by negligence

or misconduct, received the sanction of this Court.' After a full and elaborate examination of the authorities, *Mr. Justice Bradley* announces the result in these words: '(1) A common carrier cannot lawfully stipulate for exemption from responsibility where such exemption is not just and reasonable in the eyes of the law. (2) It is not just and reasonable in the eyes of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his agents.' " And in the *McConnel case:* "The defendant could not, by any stipulation in the bill of lading, contract to limit its liability for negligence in transporting goods which it receives for carriage."

It is upon these principles that we have held that the valuation clause in a bill of lading is inoperative when relied on to exempt from liability for negligence, and cannot diminish the recovery of damages caused by such negligence. *Gardner v. R. R.,* 127 N. C., 293; *Everett v. R. R.,* 138 N. C., 71; *Stringfield v. R. R.,* 152 N. C., 128; *Kissenger v. R. R.,* 152 N. C., 247; *Harden v. R. R.,* 157 N. C., 238.

It has heretofore been recognized that the cases of *Jones v. R. R.,* 148 N. C., 449, and *Winslow v. R. R.,* 151 N. C., 250, are not in harmony with the authorities in this State and elsewhere, and they are now overruled.

We are not inadvertent to the case of *Hart v. R. R.,* 112 U. S., 331, declaring a different rule as to valuation clauses in bills of lading, which has been followed in some States and denied in others; but this authority, while entitled to the greatest respect on account of the high source from which it emanates, is not controlling, as it has been held in the Federal jurisdictions that no Federal question is raised upon the facts presented by this record.

In *Latta v. R. R.,* 172 Fed. Rep., ..., the plaintiff brought suit in a State court of Nebraska to recover damages to a mare and colt, caused by the negligence of the defendant in transporting from one State to another. The case was removed to the Circuit Court of the United States for the District of Nebraska, and there tried, and upon the trial the defendant relied upon

MULE Co. *v.* R. R.

the valuation clause in a bill of lading, limiting the recovery to $220. The Circuit Court sustained the contention of the defendant, but on appeal the Circuit Court of Appeals reversed this holding upon the .ground that the Supreme Court of Nebraska had decided that the valuation clause was void under the Constitution of Nebraska, providing that "The liability of railroad corporations as common carriers shall never be limited," and that the Federal court was bound by this construction.

In *Hughes v. R. R.,* 191 U. S., the plaintiff brought suit in the courts of Pennsylvania for negligent injury to a horse, shipped from Albany, N. Y., to Cynwyd, Pa., under a bill of lading containing a valuation clause. A recovery was had in excess of the value in the bill of lading, and upon appeal the judgment rendered was affirmed by the Supreme Court of Pennsylvania. The case was then carried to the Supreme Court of the United States, by writ of error, and that Court affirmed the judgment of the courts of Pennsylvania, saying in the course of the opinion: "The first error assigned in the common pleas court raised the question as to the law of the. contract. It does not assert that any Federal right was invaded or denied. It seems to have been conceded at the trial that the law of the State of New York, where the contract was made, permitted the making of a contract limiting the liability of the carrier to the agreed valuation in consideration of the lower freight rate for carriage, the shipper having the opportunity to have the larger liability for the value of the goods if the higher rate of freight for carriage was paid. This rule also prevails in the courts of the United States (*Hart v. R. R.,* 112 U. S., 331; 28 L. Ed., 717; 5 Sup. Ct. Rep., 151), wherein it was held that a contract fairly made and signed by the shipper, agreeing on a valuation of the property carried, with a rate of freight based on such valuation, on the condition that the carrier assume liability only to the extent of such agreed valuation in case of loss by the negligence of the carrier, will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier is responsible and the freight received, and of protecting the carrier

160—15

against extravagant valuations. But this is not a question of Federal law wherein the decision of the highest Federal tribunal is of conclusive authority. In *Grogan v. Express Co.*, 114 Pa., 523 (60 Am. Rep., 360; 7 Atl., 134); the Supreme Court of Pennsylvania expressly declined to follow the rule laid down in *Hart v. R. R.*, adhering to its own declared doctrine denying the right of a common carrier to thus limit its liability for injuries resulting from negligence. The cases are numerous and conflicting, different rules prevailing in different States. The Federal courts in cases of which they have jurisdiction will doubtless continue to follow the rule of the *Hart case,* but the highest court of Pennsylvania may administer the common law according to its understanding and interpretation of it, being only amenable to review in the Federal Supreme Court where some right, title, immunity, or privilege, the creation of the Federal power, has been asserted and denied."

In the case before us the action is based on the common law, as in the *Hughes case,* and we have held that the valuation clause cannot have the effect of diminishing the recovery for damages caused by negligence, following a long line of decisions in this Court, and the same course was followed in the Pennsylvania case; and it would seem that if no Federal question could be found in the *Hughes case,* none can be found in this, in so far as the determination of the effect of the valuation clause in the bill of lading is concerned.

The defendant contends further, that if it is held that the plaintiff is entitled to recover $285, when the rate of freight was fixed upon the valuation of $100, that this would be a discrimination in favor of the plaintiff and an interference with the Interstate Commerce Act, and further, that Congress having legislated upon the subject-matter of this action, the courts of this State are without jurisdiction.

The principle involved is important, and has not been heretofore decided in this Court, although considered in the *Kissenger case,* where there is a clear intimation against the contention of the defendant.

We do not question the power of Congress to regulate interstate commerce, nor do we doubt the correctness of the decisions,

chiefly relied on, that where Congress, acting within the power conferred by the Constitution, has legislated with reference to the matter involved in the litigation, the legislation of Congress is exclusive, and the courts of the State are without jurisdiction. *T. and P. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U. S., 426; *T. and P. Ry. Co. v. Mugg,* 202 U. S., 543; *B. and O. Ry. Co. v. Pitcairn Coal Co.,* 215 U. S., 481; *Robinson v. B. and O. R. R.,* 222 U. S., 506; *Ry. v. Reid,* 222 U. S., 424.

These cases, however go no further. In the *Abilene case* the shipper sought to recover freights which he alleged to be unreasonable, but which were such as had been established and approved under the Interstate Commerce Law; in the *Mugg case* the shipper sued to recover the difference between a rate quoted to him by the carrier and the regular classified rate filed and approved by the Commission, which he had paid; in the *Pitcairn case,* to compel by mandamus the discontinuance of certain regulations adopted by certain railroad companies for the distribution of cars to coal mines in a time of car shortage, which regulations were alleged to be in violation of the Interstate Commerce Act; in the *Robinson case,* a schedule of charges for loading coal into cars was filed and approved by the Commission, under which 50 cents more per ton was charged for loading from a wagon than from a tipple. The plaintiff's shipment came under the higher rate, and conceiving that the schedule unjustly discriminated between shipments loaded from wagons and those loaded from tipples, he brought action to recover the excess.

We have stated the subject-matter of these cases for the purpose of showing that in each case a clause of the Interstate Commerce Act, or a rule or regulation of the Commission, was directly involved, and we, therefore, conclude that they are not decisive of the question before us.

We will hereafter refer to the *Reid case.*

We come then to the contention of the defendant, that to permit a recovery of more than $100, when the freight rate was fixed on the basis of that value, would be a discrimination, and that, therefore, the Interstate Commerce Act abrogates the common-law right of action to recover damages.

If we turn to the act itself, no language can be found which in express terms purports to have this effect, and the defendant must rely upon an abrogation of the right of action by implication.

This being true, the Supreme Court of the United States has laid down the rules by which the contention of the defendant is to be tested.

In the *Abilene case,* after recognizing the right at common law to recover freight charges in excess of a reasonable rate, and holding that the Commission having approved the rate, the courts could not, in the first instance, inquire into its reasonableness, the Court says: "As the right to recover, which the court below sustained, was clearly within the principles just stated, and as it is conceded that the act to regulate commerce did not, in so many words, abrogate such right, it follows that the contention that the right was taken away by the act to regulate commerce rests upon the proposition that such result was accomplished by implication. In testing the correctness of this proposition, we concede that we must be guided by the principle that repeals by implication are not favored, and, indeed, that a statute will not be construed as taking away a common-law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the preëxisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."

Again, it has been held in numerous cases that the fact that Congress has created the Interstate Commerce Commission, and given to it a large measure of control over interstate commerce, does not deprive the State of the right to enforce laws which may incidentally affect commerce, in the absence of action by Congress or the Commission as to the particular matter to be inquired of. A number of instances of such laws are collected in *Cleveland C. C. and St. L. R. Co. v. Illinois,* 177 U. S., 514, and the Court there says: "Few classes of cases have become more common in recent years than those wherein the police power of the State over the vehicles of interstate commerce has

been drawn into question. That such power exists and will be enforced, notwithstanding the constitutional authority of Congress to regulate such commerce, is evident from the large number of cases in which we have sustained the validity of local laws designed to secure the safety and comfort of passengers, employees, persons crossing railroad tracks, and adjacent property-owners, as well as other regulations intended for the public good. We have recently applied this doctrine to State laws requiring locomotive engineers to be examined and licensed by the State authorities (*Smith v. Alabama,* 124 U. S., 465; 31 L. Ed., 508; 1 Interst. Com. Rep., 804; 8 Sup. Ct. Rep., 564); requiring such engineers to be examined from time to time with respect to their ability to distinguish colors (*Nashville C. and St. L. R. Co. v. Alabama,* 128 U. S., 96; 32 L. Ed., 352; 2 Interst. Com. Rep., 238; 9 Sup. Ct. Rep., 28); requiring telegraph companies to receive dispatches and to transmit and deliver them with due diligence, as applied to messages from outside the State (*Western Union Tel. Co. v. James,* 162 U. S., 650; 40 L. Ed., 1105; 16 Sup. Ct. Rep., 934); forbidding the running of freight trains on Sunday (*Hennington v. Georgia,* 163 U. S., 299; 14 L. Ed., 166; 16 Sup. Ct. Rep., 1086); requiring railway companies to fix their rates annually for the transportation of passengers and freight, and also requiring them to post a printed copy of such rates at all their stations (*Chicago and N. W. R. Co. v. Fuller,* 17 Wall., 560; 21 L. Ed., 710); forbidding the consolidation of parallel or competing lines of railway (*Louisville and N. R. Co. v. Kentucky,* 161 U. S., 667; 40 L. Ed., 849; 16 Sup. Ct. Rep., 714); regulating the heating of passenger cars, and directing guards and guard-posts to be placed on railroad bridges and trestles and the approaches thereto (*New York, N. H. and H. R. Co. v. New York,* 165 U. S., 628; 41 L. Ed., 853; 17 Sup. Ct. Rep., 418); providing that no contract shall exempt any railroad corporation from the liability of a common carrier or a carrier of passengers, which would have existed if no contract had been made (*Chicago M. and St. P. R. Co. v. Solan,* 169 U. S., 133; 42 L. Ed., 688; 18 Sup. Ct. Rep., 289); and declaring that when a common carrier accepts for transportation anything directed to a point of

destination beyond the terminus of his own line or route, he
shall be deemed thereby to assume an obligation for its safe
carriage to its point of destination, unless at the time of such
acceptance such carrier be released or exempted from such lia-
bility by contract in writing, signed by the owner or his agent
(*Richmond and A. R. Co. v. R. A. Patterson Tobacco Co.,* 169
U. S., 311; 42 L. Ed., 759; 18 Sup. Ct. Rep., 335). In none of
these cases was it thought that the regulations were unreason-
able, or operated in any just sense as a restriction upon inter-
state commerce."

The same rule was applied in *Missouri Pac. Ry. v. Larabee
Mills,* 211 U. S., 612.

The expressions in *Southern Ry. Co. v. Reid, supra,* that Con-
gress having taken possession of the field—having taken con-
trol—are relied on to sustain the argument that this rule has
been extended, and that now the State has no power to enforce
any law which may remotely affect interstate commerce; but
the language referred to must be read with the context, and
when this is done it will be seen that the principle is sustained.

In the *Reid case* the Court quotes with approval the follow-
ing from the *Missouri Railway case, supra:* "In other words,
the mere grant by Congress to the Commission of certain
National powers in respect to interstate commerce does not of
itself and in the absence of action by the Commission interfere
with the authority of the State to make those regulations con-
ducive to the welfare and convenience of its citizens. . . .
Until specific action by Congress or the Commission, the con-
trol of the State over those incidental matters remains undis-
turbed," and then says: "The duty which was enforced in the
State court was the duty of a railroad company engaged in in-
terstate commerce to afford equal local switching service to its
shippers, notwithstanding the cars concerning which the service
was claimed were eventually to be engaged in interstate com-
merce. This duty was declared (p. 624) to be a common-law
duty which the State might, 'at least, in the absence of Con-
gressional action, compel the carrier to discharge.' The prin-
ciple of that case, therefore, requires us to find specific action

either by Congress in the Interstate Commerce Act or by the Commission covering the matters which the statute of North Carolina attempts to regulate."

The decision in the *Reid case* was upon the ground that, "By the specific provisions of the act to regulate commerce, as amended, Congress has taken control of rate making and charging for interstate shipments, and in that respect such provisions supersede State statutes on the same subject; and that a statute of North Carolina requiring common carriers to transport freight as soon as received to interstate points under penalties for failure, conflicts with the requirement of section 2 of the Hepburn Act of 29 July, 1906, ch: 3591, 34 Stat., 584, forbidding transportation until rates had been fixed and published, and is therefore unenforcible."

Tested by these rules, the right of action of the plaintiff, as it existed at common law, is unimpaired, unless its recognition by the courts would render the act to regulate commerce nugatory, or unless Congress has acted on the subject-matter of this controversy.

Congress has legislated and the Commission has made rules and regulations to compel the performance of duty, and not for the purpose of excusing negligent conduct. The rates prescribed are to afford transporting property safely, and with reasonable care, and are not based upon the assumption that the carrier will not perform its duty, and neither Congress nor the Commission has provided a remedy for negligence, nor purported to relieve from its consequences.

A jury has found in this action that the property of the plaintiff has been damaged $285 by the negligence of the defendant, and if he cannot recover that sum in this action, he is without remedy. He cannot go to Congress, nor can he go to the Commission; and if the contention of the defendant is sustained, an act of Congress designed to regulate commerce and the rules of a commission created to administer its provisions will have the effect of reducing his claim to $100.

Conceding that the right of action exists at common law, it does not render the act of Congress nugatory to enforce it, and

in the absence of action by Congress or the Commission upon the subject-matter of the controversy, there is no implied abrogation of the right.

The implication we are asked to infer compels us to write into the act of Congress words that cannot be found there, and words which, if written in the bill of lading itself, would be void, according to our authorities, to wit, "that in consideration of the rate paid the carrier shall not be liable for negligence."

The case of *Hughes v. R. R.*, 191 U. S., 477, seems to be directly in point against both contentions of the defendant. In that case the plaintiff brought his action in the court of Pennsylvania to recover damages for negligent injury to a horse shipped from New York to Pennsylvania, and the defendant relied on the valuation clause in the bill of lading, and also urged that to permit a recovery for a larger amount than that named would be in conflict with the Interstate Commerce Act. The Supreme Court of Pennsylvania held against the defendant on both points, and rendered judgment in favor of the plaintiff for the full amount of his damages, and this judgment was affirmed by the Supreme Court of the United States. In the course of the opinion, the Court says: "Upon the authority of *Missouri, K. and T. R. Co. v. Elliott*, 184 U. S., 533; 46 L. Ed., 764; 22 Sup. Ct. Rep., 446, it may be admitted that the question of the decision of the State court being in contravention of the legislation of Congress to regulate interstate commerce was sufficiently made, and the adverse decision to the party claiming the benefit of that act gives rise to the right of review here. In refusing to limit the recovery to the valuation agreed upon, did the State court deny to the company a right or privilege secured by the interstate commerce law? It may be assumed that under the broad power conferred upon Congress over interstate commerce, as defined in repeated decisions of this Court, it would be lawful for that body to make provision as to contracts for interstate carriage, permitting the carrier to limit its liability to a particular sum in consideration of lower freight rates for transportation. But upon examination of the terms of the law relied upon, we fail to find any such provision therein. The sections of the interstate commerce law

relied upon by the learned counsel for plaintiff in error (24 Stat. at L., 379-82, ch. 104, U. S. Comp. Stat., 1901, pp. 3154-3159, 25 Stat. at L., 855, ch. 382, U. S. Comp. Stat., 1901, p. 3158) provide for equal facilities to shippers for the interchange of traffic; for nondiscrimination in freight rates; for keeping schedules of rates open to public inspection; for posting the same in public places, with certain particulars as to charges, rules, and regulations; for the publication of joint tariff rates for continuous transportation over one or more lines, to be made public when directed by the Interstate Commerce Commission; against advances in joint tariff rates except after ten days notice to the Commission; against reduction of joint tariff rates except after three days like notice; making it unlawful for any party to a joint tariff to receive or demand a greater or less compensation for the transportation of property between points as to which a joint tariff is made different than is specified in the schedule filed with the Commission; giving remedies for the enforcement of the foregoing provisions, and providing penalties for their violation; making it unlawful to prevent continuous carriage, and providing that no break of bulk, stoppage or interruption by the carrier, unless made in good faith and for necessary purpose, without intention to evade the act, shall prevent the carriage of freights from being treated as one continuous carriage from the place of shipment to the place of destination. While under these provisions it may be said that Congress has made it obligatory to provide proper facilities for interstate carriage of freight, and has prevented carriers from obstructing continuous shipments on interstate lines, we look in vain for any regulation of the matter here in controversy. There is no sanction of agreements of this character limiting liability to stipulated valuations, and until Congress shall legislate upon it, is there any valid objection to the State enforcing its own regulations upon the subject, although it may to this extent indirectly affect interstate commerce contracts of carriage? It is well settled that the State may make valid enactments in the exercise of its legislative power to promote the welfare and convenience of its citizens, although in their operation they may have an effect upon interstate traffic."

The Court then considers several cases, and among them *Chicago R. R. v. Solan,* 169 U. S., 133, in which a statute of Iowa was upheld which invalidated a valuation clause in a bill of lading, and concludes as follows: "We can see no difference in the application of the principle based upon the manner in which the State requires this degree of care and responsibility, whether enacted into a statute or resulting from the rules of law enforced in the State courts.. The State has a right to promote the welfare and safety of those within its jurisdiction by requiring common carriers to be responsible to the full measure of the loss resulting from their negligence, a contract to the contrary notwithstanding. This requirement in the case just cited is held not to be an unlawful attempt to regulate interstate commerce, in the absence of Congressional action providing a different measure of liability when contracts such as the one now before us are made in relation to interstate carriage. Its pertinence to the case under consideration renders further discussion unnecessary."

This case was approved in *W. U. Tel. Co. v. Milling Co.,* 218 U. S., 406, in which, after holding that intercourse between the States by telegraph is interstate commerce, a statute of Michigan was sustained declaring that "telegraph companies shall be liable for any mistakes, errors, or delays in the transmission or delivery, or for the nondelivery of any repeated or nonrepeated message, in damages to the amount which such person or persons may sustain by reason of the mistakes, errors, or delays in the transmission or delivery, due to the negligence of such telegraph company or its agents, to be recovered with the costs of suit by the person or persons sustaining such damage," although on the face of the telegram there was a stipulation that the company should not be liable for the nondelivery of an unrepeated message beyond the amount paid for the telegram, the Court saying in conclusion: "The telegraph company in the case at bar surely owed the obligation to the milling company to not only transmit the message, but to deliver it. For the failure of the latter it sought to limit its responsibility, to make the measure of its default not the full and natural consequence of the breach of its obligation, but the mere

price of the service, relieving itself, to some extent, even from the performance of its duty. A duty, we may say, if performed or omitted, may have consequence beyond the damage in the particular instance. This the statute of the State, expressing the policy of the State, declares shall not be. For the reasons stated, we think that this may be done, and that it is not an illegal interference with interstate commerce."

The Supreme Court of South Carolina has recently decided both questions presented by this appeal against the contention of the defendant. *Elliott v. R. R.,* 75 S. E. R., 886.

There is also authority for the position that the Interstate Commerce Act, as amended in 1906, instead of taking away the right of action of the plaintiff, preserves it.

In *Latta v. R. R.,* 172 Fed. Rep., 850, the plaintiff sued to recover damages for injuries caused by negligence to a mare and colt, shipped from Nebraska to Iowa, under a bill of lading containing a valuation clause, and the action was removed to the Circuit Court of the United States. Upon the trial, the defendant relied on the clause in the bill of lading limiting the amount of recovery, and it was also shown "that the rate of $24.38 charged by the defendant for the transportation of the animals mentioned was its regular tariff based upon the valuation stated in the contract. It was also conceded at the trial that said tariff rate had been filed with the Interstate Commerce Commission, and published as required by law, and that the rules, regulations, and tariffs of the defendant on file with the Interstate Commerce Commission disclosed that the above-named rate applied to the limited liability contract in use by the company for the transportation of live stock." Upon appeal, the Circuit Court of Appeals held that the plaintiff had the right to recover the full amount of his damages, and that the Interstate Commerce Act, instead of taking away this right, preserved it, the Court saying in reference to the last question: "It is claimed, however, that Congress has legislated upon the very subject now under discussion, and that in consequence thereof the law of Nebraska, so far as it is sought to enforce the same against the provisions of a contract in relation to interstate commerce, is inoperative. In this connection our

attention is called to Act June 29, 1906, ch: 3591, sec. 7, 34 Stat. 595 (U. S. Comp. St. Supp., 1907, p. 909). In the section referred to is found the following language: 'That any common carrier, railroad or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass; and no contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability herein imposed: *Provided,* that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing laws.' It plainly appears from a reading of the above language that Congress has legislated upon the subject of the liability of railroad corporations as common carriers when engaged in interstate commerce. If it were not for the proviso accompanying the language above quoted, we should feel compelled to determine the validity of the contract in question with reference to the law of Congress. We think that the proviso found in the law above quoted was placed therein to cover just such a case as is now presented. Congress, undoubtedly, was aware of the many conflicting decisions by the courts in reference to the question as to how far common carriers could limit their common-law liability by contract, receipt, rule, or regulation. It therefore was aware that the Constitution of Nebraska, as interpreted by her Supreme Court, was in con-- flict with the rule established by the United States Supreme Court in *Hart v. Railway Co., supra;* and was also aware that the Supreme Court of Pennsylvania in *Grogan v. Adams Express Co.,* 114 Pa., 523 (7 Atl., 134; 60 Am. Rep., 360), refused to follow the rule established by said case of *Hart v. Railway Co., supra;* and therefore, in view of these conflicting opinions, very wisely provided that the legislation by Congress should not deprive 'any holder of such receipt or bill of lading of any remedy or right of action which he had under existing law.'

We are therefore of the opinion that the right which the plaintiff in this case had under the law of Nebraska to sue for the full value of his property was not taken away by the legislation of Congress herein referred to, but was preserved to him, and that he may now enforce that right as he has attempted to do."

We conclude, upon reason and authority:

(1) That under the common law as administered in this State, the valuation clause in a bill of lading does not relieve from the consequences of negligence.

(2) That if the common law was different, the Legislature of the State would have the power to pass an act providing that such a clause should not relieve against negligence.

(3) That the Supreme Court of the United States recognizes and follows the decisions of the courts of the State on this question, in cases originating in the State courts, whether based on the common law or statute, although it would hold otherwise in cases originating in the Federal jurisdiction.

(4) That Congress has not, in the act to regulate commerce, purported to relieve against negligence.

(5) That Congress having failed to act in this particular, this State may administer its own laws and enforce its settled policy.

(6) There being no express language in the act of Congress abrogating the common-law right of action of the plaintiff, if abrogated at all, it must be by implication.

(7) That the abrogation of the right will not be implied, unless to permit it to exist would render the act of Congress nugatory.

(8) That the enforcement of the right of action is not in conflict with the terms or purpose of the act of Congress, and therefore its abrogation will not be implied.

(9) That if Congress has legislated upon the matter in controversy, the right of action of the plaintiff is preserved by the proviso in the act.

We are, therefore, of opinion there is no error.

No error.

CLARK, C. J., concurring: No question as to rates, nor as to the power of the Interstate Commerce Commission to regu-

late rates, arises in this case. The sole question is whether under the guise of fixing rates the carrier can make a collateral stipulation which shall relieve it from payment in part of damages sustained by the shipper because of the negligence of the carrier. If the carrier could thus relieve itself by contract of part of the consequence of its negligence, it could relieve itself altogether. It is well settled that this cannot be done. Besides the authorities cited in the opinion of *Mr. Justice Allen* in this case, they can be found collected in the opinion of *Mr. Justice Walker* in *Kime v. R. R.*, at this term.

The carrier can relieve itself by contract, in proper cases and for a reasonable consideration, from its liability as insurer, but it cannot stipulate to be relieved either in whole or in part from liability to pay for damages caused by its negligence.

BROWN, J., dissenting: The fact that Congressional legislation on matters relating to interstate commerce may interfere with the exercise of the police power by the State, or may contravene the public policy of the State, is not sufficient to prevent the operation of such legislation. The Federal statute is supreme. Therefore, if Congress has, by its enactments, covered the subject of rate making and charging in its relation to interstate commerce, the right of a State, through either its Legislature or its courts, to regulate or interfere with such rate making and charging is destroyed. This is fundamental, and I do not understand it to be controverted by the opinion of the Court. That opinion seems to be based upon the view that Congress has not acted upon the subject, and, therefore, the State courts have the right to apply to the situation the law in force in the State. I am forced by the decisions of the Supreme Court of the United States to reach a different conclusion.

It has recently been held by that Court that Congress has completely taken control of the subject of rate making and charging by the provisions of the act to regulate commerce and the amendments thereto. *Southern Railway Co. v. Reid*, 222 U. S., 424. Upon the authority of that case inhibitive Congressional legislation is not required to prevent the application of State legislation upon incidental matters relating to inter-

state commerce. It is said to be sufficient if Federal legislation occupies the field. After discussing the power conferred upon the Interstate Commerce Commission by the act to regulate commerce, *Mr. Justice McKenna* says in the *Reid* case: "It is evident, therefore, that Congress has taken control of the subject of rate making and charging. All of the particular details we cannot set forth without extensive quotations from the act, which it is quite inconvenient to make. The provisions of the act are directed at the abuses most to be feared—unreasonableness in the rates and discriminations, including in the latter discriminations in service, in the acceptance and delivery of freight, and in facilities furnished." And again referring to the act to regulate commerce, *Mr. Justice McKenna* uses this sweeping language: "There is scarcely a detail of regulation which is omitted to secure the purpose to which the Interstate Commerce Act is aimed. It is true that words directly inhibitive of the exercise of State authority are not employed, but the subject is taken possession of."

It is not denied that Congress has so far conferred upon the Interstate Commerce Commission the power to regulate interstate rates as to destroy the jurisdiction of the State courts to pass upon the reasonableness of such rates. The plain language of the United States Supreme Court in the *Abilene Cotton Oil Co.* case, 204 U. S., 426, placed that matter beyond dispute. But it is asserted that although a State court cannot by its action directly regulate the rate to be charged for an interstate shipment, it can destroy the relation of the value of shipment to the rate charged, as fixed by the tariffs on file with the Interstate Commerce Commission, without encroaching upon the power vested in the Commission by the act to regulate commerce. I think this is doing indirectly the very thing prohibited by the *Abilene* case. It is not sufficient, to sustain that position, to say, in this case, that the action is one for negligence, and that the plaintiff has been damaged $285, and if he cannot recover that sum he is without remedy. He has the remedy which he has contracted to accept and which was made the basis of the rate on which his shipment moved. He agreed for a valuable consideration that his remedy should be restricted

to the recovery of $100, and he did this with knowledge that the extent of his remedy was determined by the rate of freight, and that for every increase of 20 per cent in rate, the amount which he would be entitled to recover would be increased 100 per cent, as provided by the tariff on file with the Interstate Commerce Commission. It is said that the rates prescribed "are not based upon the assumption that the carrier will not perform its duty." In what other way could the carrier be liable for injury to animals in transportation? Negligence is essential to create liability. The contract of shipment in this case provided that *"should damage occur for which the said carrier may be liable,* the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed for a horse or mule $100, which amount, it is agreed, is as much as such animals as are herein agreed to be transported are worth." The rate charged was $170 for the car-load of mules, which rate was on file with the Interstate Commerce Commission in a tariff containing this provision: "Live stock subject to the following rules, viz.: Rates on live stock will apply when the declared value does not exceed the following: Horses or mules, each, $100. For every increase of 100 per cent or fraction thereof in the declared value there shall be an increase of 20 per cent in rate." The meaning of this provision is plain. It is contemplated that where the shipper accepts a rate based upon the value of the animals as declared, he is restricted to the recovery of such value, regardless of the character of his claim. The very purpose of this provision of the tariff is to establish a relation between the value of the thing shipped and the rate. This method of rate making not only has the sanction of the Interstate Commerce Commission, but has the approval of the Supreme Court of the United States. In *Hart v. R. R.,* 112 U. S., 331, a contract of carriage, agreeing on the valuation of the property carried, was upheld as "a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives."

Congress has conferred upon the Interstate Commerce Commission the power to regulate rate making in its application to

interstate commerce; the declared value of the article shipped is a proper basis for fixing freight rates; the carrier in the present case has fixed its rates upon such basis and has filed its tariff containing such rates with the Interstate Commerce Commission in strict accordance with the provisions of the act to regulate commerce. The question arises: Has a State power to enforce a greater responsibility than that fixed by the tariff on file with the Commission and made the basis of the rate paid by the shipper? If the State court has no power to pass upon the reasonableness of an interstate rate in the absence of action by the Interstate Commerce Commission, as was declared in the *Abilene Cotton Oil Co. case,* it seems to me that it follows as an unavoidable conclusion that such courts are denied the power to change an interstate rate by altering the relation of the value of the article shipped to such rate.

We must assume that the rates and regulations on file with the Interstate Commerce Commission are reasonable until determined to be unreasonable by the Commission (*Erie Railroad Co. v. Lumber Co.,* 75 N. J. Law, 878), and it is the duty of the State court to enforce such rates and regulations. *Abilene Cotton Oil Co. case, supra.* It was, therefore, the duty of the Court to restrict the plaintiff's recovery in this action to the valuation which was made the basis of the rate filed with the Commission.

In *Poor Grain Co. v. C. B. and Q. Ry. Co.,* 12 I. C. C. Rep., 418, *Commissioner Harlan* says: "When once lawfully published, a rate so long as it remains uncanceled is as fixed and unalterable, either by the shipper or the carrier, as if the particular rate had been established by a special act of Congress. When regularly published, it is no longer the rate imposed by the carrier, but the rate imposed by the law."

In the present case the carrier charged the shipper $170 to transport a car-load of twenty-six mules from East St. Louis, Mo., to Raleigh, N. C. The rate was based upon the declared valuation of $100 as provided by the tariff. If the shipper had declared a valuation of $285, the valuation of the mule as fixed by the jury, the rate according to the tariff would have been $238 for the car-load. If the judgment is sustained, the plain-

160—16

tiff has secured the transportation of his car-load of mules for
$170, when the published tariff rate is $238. The act to regu-
late commerce, sec. 6 (as amended in 1906 and 1910), provides
that no carrier shall "charge or demand or collect or receive a
greater or less or different compensation for such transportation
of passengers or property, or for any service in connection
therewith, between the points named in such tariffs than the
rates, fares, and charges which are specified in the tariff filed
and in effect at the time, nor shall any carrier refund or remit
in any manner or by any device any portion of the rates, fares,
and charges so specified, nor extend to any shipper or person
any privileges or facilities in the transportation of passengers
or property, except such as are specified in such tariffs." The
judgment in this case forces the defendant to violate the pro-
visions of this section.

In the *Abilene Cotton Oil Co.* case the purposes of the act to
regulate commerce are set forth, and *Chief Justice White* says:
"It is apparent that the means by which these great purposes
are to be accomplished was by placing upon all carriers the
positive duty to establish schedules of reasonable rates which
should have a reasonable application to all, and which should
not be departed from so long as the established schedule re-
mained unaltered in the manner provided by law." After citing
cases, the learned *Chief Justice* continues: "When the general
scope of the act is enlightened by the considerations just stated,
it becomes manifest that there is not only a relation, but an in-
dissoluble unity, between the provision for the establishment
and maintenance of rates until corrected in accordance with the
statute and prohibitions against preference and discrimination."
One of the important purposes of the act is to insure uniformity
and prevent discrimination in freight rates, and certainly any
action by the State through its courts which results in destroy-
ing such uniformity and creating a discrimination is violative
of the act. Uniformity in the application of the established
rate will be destroyed if the State courts shall have the power to
disturb the relation between the declared value of the article and
the rate. A shipper can declare a value of $100 and secure the
low rate based upon that value. When the shipment reaches its

destination the amount which he will be entitled to recover in case of loss or damage will be submitted to a jury for determination and the declared value will be ignored. A dozen shippers may declare the same value, secure the same rate, and recover a different amount. Uniformity in the application of the rate is clearly destroyed.

This judgment forces a discrimination in favor of shippers whose animals are transported to North Carolina, and against the shipper whose animals are shipped to those States in which the valuation fixed by the contract of shipment is upheld. If North Carolina is the destination of the shipment, the shipper can declare a value of $100, secure the low rate, and recover ten times that amount if he can prove such damage. The shipper who selects one of the States referred to as the destination of his shipment will be forced to accept $100 for loss or damage to each animal regardless of the extent of his loss. The same result is brought about if the validity of the contract is to be determined by the law of the place of shipment. The amount of damages will be determined by the rules in force in the various States. Elliott on Railroads, sec. 1510; 6 Cyc., 398. If this condition is permitted to exist uniformity will be destroyed and discrimination will take its place.

In *Armour Packing Co. v. United States,* 209 U. S., 57, *Mr. Justice Day,* dealing with a violation of the act by carrying out a contract for a rate after the rate had been changed by publication of a higher rate, said: "The Elkins act proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service under the same conditions should be the one established, published, and posted as required by law. It is not so much the particular form by which, or the motive for which, this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates, duly posted and published."

The language of *Mr. Justice Van Devanter* in the case of *Robertson v. B. and O. R. R. Co.,* 222 U. S., 506, leaves no

doubt of the purpose of Congress to confer upon the Interstate Commerce Commission the sole power and duty to regulate all matters relating to the subject of interstate freight rates. It is held in that case that an inquiry into the reasonableness of a rate shall be made by the Commission before resort to the courts. *Justice Van Devanter* says: "When the purpose of the act and the means for the accomplishment of that purpose are understood, it is altogether plain that the act contemplated that such an investigation and order by the designated tribunal, the Interstate Commerce Commission, should be a prerequisite to the right to seek reparation in the courts because of exactions under an established schedule alleged to be violative of prescribed standards; and this is so because the existence and exercise of a right to maintain an action of that character, in the absence of such an investigation and order, would be repugnant to the declared rule that a rate established in the mode prescribed should be deemed the legal rate, and obligatory alike upon carrier and shipper until changed in the manner provided, would be in derogation of the power expressly delegated to the Commission, and would be destructive of the uniformity and equality which the act was designed to effect."

In addition to the authorities already cited, the following cases support the statement that Congress has conferred upon the Interstate Commerce Commission authority to regulate commerce, including the right to fix and approve rates and regulations governing such rates: *T. and P. Ry. v. Mugg,* 202 U. S., 242; *McNeill v. Southern Ry.,* 202 U. S., 543; *B. and O. R. R. v. Pitcairn Coal Co.,* 215 U. S., 481; *Robinson v. B. and O. R. R.,* 222 U. S., 506; *Chicago and A. R. Co. v. Kirby,* U. S. S. C. Advance Sheets, 15 July, 1912.

In *T. and P. Ry. v. Mugg,* 98 Tex., 353, it was attempted to base a right of recovery upon the misrepresentation of an agent in quoting an interstate rate. The Texas court upheld the right to recover damages, notwithstanding the fact that the rate quoted was the rate published and on file with the Interstate Commerce Commission. The decision was put upon the ground that the question of rates was not involved, and that the action was based upon the misstatement of the agent, which induced

the shippers to make contracts which resulted in loss. Upon appeal to the Supreme Court of the United States, the judgment of the Texas court was reversed. *T. and P. Ry. Co. v. Mugg, supra.*

The *Hughes case,* 191 U. S., 477, is said to be an authority in support of the position that Congress has not legislated on the subject-matter of this action. That decision was rendered in 1902. I have examined the act to regulate commerce as it was in force at that time, and find that it has since been extensively amended, and the power of the Interstate Commerce Commission has been enlarged. This was accomplished by amendments in 1906 and in 1910. The enlargement of the scope of the act and the recent decisions of the Supreme Court of the United States, considered in connection with the facts of this case, lead me to conclude that the *Hughes case* is not to be regarded as authority against the position that Congress has now taken control of the subject of rate making and charging, and conferred upon the Interstate Commerce Commission the power to pass upon questions relating to that subject. Each amendment of the act was made with the view of extending the jurisdiction of the Commission over interstate commerce, and the language of the entire act leaves no doubt of the purpose of Congress to have one tribunal to pass upon the intricate problems of rate making. In this way alone can uniformity be secured and discrimination prevented.

The scope of the power of the Interstate Commerce Commission is illustrated by section 15 of the act, by the provisions of which the Commission is given authority, among other things, to investigate any "regulations or practices whatsoever of such carrier or carriers subject to the provisions of this act" as are alleged to be "unjust and unreasonable or unjustly discriminatory, or unduly preferential or prejudicial or otherwise in violation of any of the provisions of this act"; and "the Commission is hereby authorized and empowered to determine and prescribe . . . what individual or joint classification, regulation, or practice is just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease or desist from such violation to the extent to which the Commission finds the same to exist."

Under the provisions of this last section the Interstate Commerce Commission has assumed jurisdiction to determine the validity of a stipulation in a bill of lading fixing the basis upon which damages should be determined in case of loss or damage. In *Shafer v. R. R.,* 21 I. C. C. Reports, 8, the complainant alleged that a provision in the uniform bill of lading used by the defendant that fixes the amount of damages for which a carrier is liable at the invoice value of the property at a point of shipment is unjust and unreasonable and prevents the defendant from paying to the complainant just compensation for the loss of a car-load of wheat which the defendant misdelivered. to another party; and complainant prayed that an order be entered directing the defendant to pay the value of the property at point of delivery. The Interstate Commerce Commission not only assumed jurisdiction, but held that the stipulation of the bill of lading was reasonable and valid. The report of the Commission quotes the above parts of section 15, and says: "Under the law, therefore, the Commission has authority to consider and determine the reasonableness of regulations and practices in respect of issuance, form, and substance of bills of lading, and to determine and prescribe what regulations and practices are reasonable."

It is said in the opinion of the Court that the effect of the Hepburn Act is to prohibit agreements fixing the value of the article shipped and restricting liability to such value in case of loss or damage by negligence. The Supreme Courts of Massachusetts, New York, and New Jersey have taken the opposite view. The cases are well considered, and I can add nothing to what is said by the learned judges of those courts. *Bernard v. Express Co.,* (Mass.) 91 N. E., 325; *Greenwald v. Barrett,* 199 N. Y., 170; *same case,* 115 N. Y. Supp., 311; *Travis v. Wells-Fargo Co.,* 79 N. J. Law, 83.

In *Travis v. Wells-Fargo Co.* it is held: "In an action against a common carrier for goods lost in transit, a receipt was put in evidence, in which receipt the defendant limited its liability to the sum of $50, unless a greater value was stated by the shipper. The trial court held that section 20 of the Interstate Commerce Act of 1906 (the Hepburn Act) prohibited a

common carrier from so limiting its liability by contract. *Held,* that this was error, as that section of the Federal statute only prohibited any contract which exempted such carrier from liability from losses caused by a connecting carrier to which the defendant had delivered the goods." In *Greenwald v. Barrett* it is held by the Supreme Court of Appeals of New York that, "The language of the act of Congress commonly known as the Hepburn Act, being an amendment to section 20 of the Interstate Commerce· Act, does not abrogate the right of common carriers either to regulate their charges for carriage by the value of the goods, or to agree with the shipper upon a valuation of the property carried."

I conclude from the authorities referred to that Congress has conferred upon the Interstate Commerce Commission the power to regulate rates on interstate commerce; that a rate established and on file with the Commission is presumed to be reasonable until declared by the Commission to be otherwise; that such rate must be strictly adhered to by the shipper and carrier as long as it remains in force; and, finally, that a State court is without jurisdiction to interfere directly or indirectly with an interstate rate properly established and published and on file with the Interstate Commerce Commission as provided by the act to regulate commerce.

WALKER, J., dissenting: I concur in the dissenting opinion of *Justice Brown.* The Court now reverses its former rulings in *Jones v. R. R.,* 148 N. C., 580 (decided by a unanimous Court), and *Winslow v. R. R.,* 151 N. C., 250, and, as I think, *Gardner v. R. R.,* 127 N. C., 293, which cases are clearly sustained, in principle, at least, by *Mitchell v. R. R.,* 124 N. C., 246; *Selby v. R. R.,* 113 N. C., 588, and *Everett v. R. R.,* 138 N. C., 71, in the last of which cases *Justice Hoke.* said, when addressing himself to this subject: "Such agreements are upheld where, the carrier being without knowledge or notice of the true value, the parties agree upon a valuation of the particular goods shipped, approximating the average value of ordinary goods of like kind, and make such valuation the basis of a just and reasonable shipping rate." The cases cited by the Court,

in its opinion, did not repudiate or even modify the general
rule we had adopted, after much consideration and discussion
of the matter, but were simply decided upon the ground that
the rule was not applicable to their peculiar and exceptional
facts. The stipulation in the bill of lading, as to value, is not
any attempted evasion by the railroad company of its liability
for negligence as a carrier, which still remains, as is said in
*Kime v. R. R.,* at this term, but it is merely a legitimate, rea-
sonable, and lawful arrangement for the liquidation of the quan-
tum of damages, upon a just basis, should a loss occur by the
negligence of the carrier, for it does not relieve him of any
obligation to exercise diligence, fidelity, and care. It is not,
by any means, unusual for parties to agree beforehand upon
the extent of the recovery in the way of stipulated damages,
where there is a breach of contract, and such agreements have
been upheld by the courts, even if the breach is intentional or
willful, or amounts technically, as in this case, to a tort. Our
former and well-considered decisions, now overturned, were in
perfect harmony with the view of the Supreme Court of the
United States in *Hart v. R. R.,* 112 U. S., 331 (28 L. Ed., 717),
in which it was held that where a contract of carriage, signed
by the shipper, is fairly made with a railroad company, agree-
ing on the valuation of the property carried, with the rate of
freight based on the condition that the carrier assumes liability
only to the extent of the agreed valuation, even in case of loss
or damage by the negligence of the carrier, the contract will
be upheld as a proper and lawful mode of securing a due pro-
portion between the amount for which the carrier may be respon-
sible and the freight he receives, and of protecting himself
against extravagant and fanciful valuations. It will be seen
from this statement of the law that the liability of the carrier
for negligence, in the receipt, transportation, and delivery of
the goods entrusted to him, is in no degree diminished, but the
clause by which the value of them is fixed is for the twofold
purpose of determining what is a reasonable tariff rate and of
protecting the carrier against imposition and fraud, as well as
to predetermine the damages in case of a loss. There is nothing
unlawful or oppressive in this arrangement, and no attempt to

take advantage of the shipper, but, on the contrary, the stipulation prevents the shipper from taking any advantage of the carrier by a false representation as to value. The charge for carriage must be settled beforehand by some fixed standard.

In *York Co. v. R. R.,* 70 U. S. (3 Wall.), 107, the same Court held that "A common carrier may prescribe regulations to protect himself against imposition and fraud, and fix a rate of charges proportionate to the magnitude of the risks he may have to encounter." And in *R. R. v. Lockwood,* 84 U. S. (18 Wall.), 357, the Court, while recognizing fully the general rule that a common carrier cannot lawfully stipulate for exemption from responsibility if the exemption is not just and reasonable, and that it is not so for a common carrier to stipulate for his exemption from responsibility for the negligence either of himself or his servants, nevertheless decided it to be "just and reasonable that he should not be held responsible, in law, for losses happening by sheer accident, nor chargeable for valuable articles liable to be damaged, unless apprized of their character or value."

We have referred to the law as thus stated by courts entitled to our highest respect, and whose decision on any particular question of general law, though not conclusive upon us, is not to be lightly considered or disregarded, but should have the greatest weight with us in deciding the same or similar questions, for the purpose of showing clearly the difference between *Kime v. R. R.* and this case, and it is emphasized and accentuated in this passage taken from the opinion of *Justice Blatchford* in *Hart v. R. R., supra:* "The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is stopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, be upheld. There is no

violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss."

In *Kime's case* we were discussing the right of the carrier to limit his liability, at common law, as an insurer, and also for negligence. We held that he might rid himself of his liability as insurer by notice given in advance to the shipper, if the agreement made in response thereto is reasonable and founded upon a fair consideration and conforms to the sound public policy by which the obligations of the carrier to the public are settled (6 Cyc., 396), but that he cannot stipulate for an exemption from responsibility for a loss of goods caused by his negligence in their transportation. The question decided in this case was not presented, as the judge instructed the jury, in *Kime's case,* that the stipulation in the bill of lading, that the carrier assumed liability only to the extent of the agreed valuation, which was $100 for each horse in the car-load, was valid, and that they should assess plaintiff's damages accordingly. He did not appeal, and therefore could not avail himself in this Court of any error in the charge, if there was any, nor could defendant, as it was in its favor, and I then thought, and still think, that there was none. But the question as to the validity of the clause which provides for the payment of a stipulated amount or the agreed value of the goods was not involved in that case at all, the only issue being as to the negligent conduct of the defendant railroad company in the carriage of the horses from Richmond, Va., to Burlington, N. C., and we held that the stipulation in the bill of lading as to the examination of the car by the shipper did not so far limit the responsibility of the defendant as to relieve it from the exercise of due and proper care in the transportation, and that loading and transporting the horses in a close car, without any ventilation, and almost air-tight, which caused them to be smothered, so that they staggered as they were being unloaded at Burlington and had to be assisted from the car, was itself gross, if not wanton,

negligence. The distinction is clearly to be seen between such a case, where the attempt of the carrier was to limit his liability for a negligent transportation, and a clause fixing the amount of the recovery or quantum of damages if the horses were injured by such negligence, and obtaining a considerable reduction in the freight charges by a fair and optional agreement as to value.

I have said this much in the case, not for the purpose of vindicating our former opinions at the present time, but to show how unlike this case is that of *Kime v. R. R.,* decided at this term, and in which, at its request, I expressed the views and stated the conclusions of the Court. I may, perhaps, have occasion to discuss the other question later, when I will attempt to show, by reason and, as I think, by the great weight of authority, that the view we formerly entertained is the correct one. Nor do I intend, now, to dwell upon the remaining question, viz., whether by the recent amendments to the Interstate Commerce Act the Congress has not made the question of fixing the rate by an agreed valuation, or upon such a valuation as its basis, one of Federal law, so that when the schedules are filed with the Interstate Commerce Commission that body is vested with the power to determine as to the reasonableness and validity of the rates, it having actually decided that such an agreement as is now in question is a valid one and that a lawful rate is established thereby. I am thoroughly satisfied, in all these respects, with the able and learned opinion of *Justice Brown,* in which I have concurred, and which to my mind presents unanswerable arguments in support of our views. If it is a Federal question, the decision of the Court in *Hart v. R. R.* and in *Hughes v. Railway,* cited in the principal opinion in this case, in which the Court adheres to its former rulings, are controlling upon us, however much we may differ with that Court in its reasoning and conclusion.